FILED-CLERK
U.S. DISTRICT COURT
03 JAN 30 AM 11:14
TEXAS-EASTERN
BY_____

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, <br><br>Plaintiff, <br><br>v. <br><br>1. JOHN A. WHEELER, <br>2. LONG POINT INVESTMENTS, LLC and <br>3. CDM TECHNOLOGIES, LLC <br><br>Defendants, <br><br>and <br><br>4. WALTER S. COLE, <br>5. MARC DONATELLI, <br>6. MICHAEL FAGAN, <br>7. ROBERT MENDOZA, and <br>8. GARY WOOD <br><br>Relief Defendants. | CIVIL ACTION NO. 6'03cv42 |

**COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND FOR CIVIL PENALTIES UNDER THE COMMODITY EXCHANGE ACT**

**I.**

**SUMMARY**

1. Since at least December 2000 through May 2002 (the "relevant period"), John A. Wheeler ("Wheeler"), with the assistance of the Relief Defendants, who were known as profit sharing account ("PSA") agents, fraudulently solicited, accepted and

pooled at least $35 million from at least 810 participants ("investors"). Wheeler invested some investor funds in business ventures, which purported to yield high rates of return, such as certificates of deposit, mutual funds and foreign bank investments touting 200 to 300 per cent returns. Wheeler's investments included at least some purported trading in foreign currency futures contracts with an entity known as Giovanni Fleury Investments ("Fleury"). At present, the investors are owed at least $23 million.

2. In connection with soliciting funds for the trading of foreign currency futures contracts, Wheeler, acting individually or as an agent for Long Point Investments, LLC ("Long Point") or CDM Technologies, LLC ("CDM"), two companies he set up and operated, defrauded investors by misappropriating at least $8.4 million, which he used for personal and luxury expenditures, and by making material misrepresentations about the profitability and risk of his foreign currency investments. In addition, Wheeler sent false written account statements to investors, concealing material facts, including that he could not repay investors the amounts of money reported on the statements due to his investment losses and his diverting investor funds for his personal use and benefit. Wheeler also concealed his losses by using monies received from "new" investors to repay "earlier" investors, in a manner akin to a Ponzi scheme, while promising new investors repayment of their investments from his purported profits.

3. Thus, Wheeler, Long Point and CDM (collectively the "Defendants") have engaged, are engaging, or are about to engage in acts and practices which violate Sections 4b(a)(2)(i)-(iii), of the Commodity Exchange Act, as amended ("Act"),

7 U.S.C. §§ 6b(a)(2)(i)-6b(a)(2)(iii), and Commission Regulation 1.1(b) thereunder, 17 C.F.R. § 1.1(b) (2002).

4. Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2001), Plaintiff Commodity Futures Trading Commission ("Commission" or "CFTC") brings this action to enjoin the unlawful acts and practices of defendants Wheeler, Long Point and CDM to compel their compliance with the provisions of the Act and Regulations thereunder. In addition, the Commission seeks civil penalties, an accounting and such other equitable relief as the Court may deem necessary or appropriate. The Commission also seeks disgorgement of investor funds from the Relief Defendants.

## II.

## JURISDICTION AND VENUE

5. The Act prohibits fraud in connection with the trading of commodity futures contracts and establishes a comprehensive system for regulating the purchase and sale of such contracts. This Court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2001), which authorizes the Commission to seek injunctive relief against any person whenever it shall appear that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation or order thereunder.

6. Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2001), in that defendants are found in, inhabit, or transact business in this district, and the acts and practices in violation of the Act have occurred, are occurring, or are about to occur within this district, among other places.

## III.

## THE PARTIES

7. Plaintiff <u>Commodity Futures Trading Commission</u> is an independent federal regulatory agency that is charged with responsibility for administering and enforcing the provisions of the Act, 7 U.S.C. §§ 1 *et seq.* (2001), and the Regulations promulgated thereunder, 17 C.F.R. §§ 1 *et seq.* (2002).

8. Defendant <u>John A. Wheeler</u> currently resides on a ranch located in Nacogdoches, Texas. John Wheeler formed and at all relevant times was the day-to-day decision maker for Long Point and CDM; he was the sole general manager of Long Point and secretary of CDM. Wheeler committed the acts alleged in this complaint individually and as an agent of Long Point and CDM. Wheeler has never been registered with the Commission in any capacity.

9. Defendant <u>Long Point Investments, LLC</u> is a limited liability company created on June 27, 2000, and domiciled in Nevis, West Indies. Long Point has never been registered with the Commission in any capacity.

10. Defendant <u>CDM Technologies, LLC</u> is a Nevada limited liability company created on June 18, 2000, and located at 1005 Terminal Way, Suite 110, Reno, Nevada 89502. CDM has never been registered with the Commission in any capacity.

## RELIEF DEFENDANTS

11. <u>Walter S. Cole</u> ("Cole") currently resides in Liberty, Texas. As a PSA agent, Cole solicited funds for defendants. Cole also invested $41,000 with defendants. Defendants paid Cole $360,500, purportedly as interest and commissions. Cole received

funds of at least $319,500 to which he was not entitled. Cole has never been registered with the Commission in any capacity.

12. <u>Marc Donatelli</u> ("Donatelli") currently resides in Arlington, Texas. As a PSA agent, Donatelli solicited funds for defendants. Donatelli also invested $50,000 with defendants. Defendants paid Donatelli $246,000, purportedly as interest and commissions. Donatelli received funds of at least $196,000 to which he was not entitled. Donatelli has never been registered with the Commission in any capacity.

13. <u>Michael L. Fagan</u> ("Fagan") currently resides in Lacombe, Louisiana. As a PSA agent, Fagan solicited funds for defendants. Fagan also invested $120,000 with defendants. Defendants paid Fagan $353,000, purportedly as interest and commissions. Fagan received at least $233,000 to which he was not entitled. Fagan has never been registered with the Commission in any capacity.

14. <u>Robert Mendoza</u> ("Mendoza") currently resides in Reno, Nevada. As a PSA agent, Mendoza solicited funds for defendants. Mendoza also invested $42,000 with defendants. Defendants paid Mendoza $151,000, purportedly as commissions. Mendoza received at least $109,000 to which he was not entitled. Mendoza has never been registered with the Commission in any capacity.

15. <u>Gary S. Wood</u> ("Wood") currently resides in Shingle Springs, California. As a PSA agent, Wood solicited funds for defendants. Wood also invested $90,000 with defendants. Defendants paid Wood $1,091,000, purportedly as commissions. Wood received at least $1,001,000 to which he was not entitled. Wood also received a Porsche automobile valued at approximately $125,000 and a Rolex watch, both of which were

purchased with investor funds. Wood has never been registered with the Commission in any capacity.

## IV.

## FACTS

A. **Wheeler's Foreign Currency Trading Program**

16. From at least December 2000, Wheeler, individually and as an agent of Long Point and CDM, solicited investment funds from members of the public for purposes of trading foreign currencies, among other investments. Individuals known as PSA agents assisted Wheeler in soliciting such funds, which were made payable to Wheeler personally or to Long Point or CDM.

17. Wheeler structured the transactions on paper as purported "loans" for "business purposes." Wheeler, Long Point or CDM gave promissory notes to the investors and the parties also executed a loan agreement. The typical loan agreement was for a one-year period and promised the lender interest at the rate of 6 or 8 per cent per month, compounded monthly on the outstanding balance of principal and accrued unpaid interest.

18. Wheeler solicited funds by telling prospective investors that their funds would be pooled together and that repayment of their so-called loans was tied to the success of his investments in foreign currencies, among other investments. Wheeler did not disclose to investors that he would use the funds for personal expenses. Rather, Wheeler represented that his compensation would only come from profits derived from the investments.

### B. Wheeler's Operation of Long Point and CDM

19. Wheeler formed both Long Point and CDM and made all day-to-day decisions for the companies. Wheeler introduced himself to prospective investors as the de facto head of Long Point and CDM. In addition, Wheeler was solely responsible for all investment decisions, particularly those relating to the investment of pooled funds in foreign currency futures trading.

20. Wheeler had signatory authority over all of the bank accounts maintained in his name and under the names of Long Point and CDM, and he controlled the movement of monies in those accounts.

21. On many occasions, Wheeler hosted free dinner meetings and barbeques to solicit investor funds for his foreign currency trading program. He accepted phone calls from potential and current investors and met with them in person to explain his investment program and to tout its profitability and lack of risk. After receiving investor funds, Wheeler executed all purported loan documentation in his name or on behalf of Long Point or CDM.

### C. The Role of the PSA Agents (Relief Defendants)

22. The PSA agents were individuals recruited by Wheeler for purposes of soliciting investors. For each investor the PSA agent referred to Wheeler who invested with Wheeler, commencing the second month after receiving the investment, Wheeler paid the PSA agent a trailing monthly commission equal to 2 per cent of the compounded value of the purported loans they referred. If an individual had multiple loans, the PSA agents received a 2 per cent commission on each loan and if a loan was renewed each

additional year, the PSA agent received a commission for eleven of the twelve months the "renewed" loan was outstanding. The PSA agents also had purported loans with either Wheeler, Long Point or CDM.

**D.     Long Point's Foreign Currency Futures Trading Account**

23.    Prior to December 2000 and continuing through March 2001, Wheeler funded an account in the name of Long Point to trade foreign currency futures with an entity named Giovanni Fleury Investments ("Fleury"). During the period November 2000 through March 2001, Wheeler funded this account with investor funds totaling $860,000. In less than five months, by the end of March 2001, Long Point lost its entire investment with Fleury.

24.    The foreign currency transactions entered into between Long Point and Fleury were futures contracts. The contracts were for future delivery of foreign currencies that were cash settled in US dollars. The prices were established at the time the contracts were initiated. Long Point entered into these futures contracts to speculate and profit from anticipated price fluctuations in the foreign currency market and not to take delivery of the foreign currency purchased as a consequence of its investment.

**E.     Wheeler Made Material Misrepresentations and Omissions to Investors**

25.    Because Wheeler used no written promotional materials, his primary method of soliciting investors was through referrals received from his group of PSA agents and by hosting free dinner meetings and barbeques. The PSA agents arranged the dinner meetings, which were held at hotels in California, Nevada and Texas. Wheeler

hosted the barbeques at his ranch in Nacogdoches, Texas. Attendees at these meetings ranged from 50 to over 200 people.

26. In soliciting investors, Wheeler falsely represented that he was able to repay investors their principal and interest because of his "guaranteed" monthly profit of 25 per cent earned through trading foreign currencies. To allay investor fears, Wheeler downplayed the risks of foreign currency trading by stating that he could limit losses.

27. In soliciting investors after March 2001, Wheeler never told prospective investors about Long Point's $860,000 loss incurred through foreign currency futures trading with Fleury, nor did Wheeler tell investors about any losses his investments had incurred.

F. **Wheeler Misappropriated Investor Funds**

28. During the relevant period, Wheeler misappropriated at least $8.4 million of the $35 million or more of the investor funds he accepted, and he may have misappropriated as much as $18 million. Of the funds he misappropriated, Wheeler spent: a) at least $1.9 million on gambling debts and casino vacations; b) at least $889,000 on the purchase of jewelry, including two ten carat diamond rings and two Rolex watches; c) at least $620,000 on the purchase or lease of automobiles and automobile expenses, including two Mercedes Benz automobiles; d) at least $1.2 million on the remodeling of his residence located on the ranch in Nacogdoches, Texas; e) at least $379,000 on home furnishings and art objects; and f) at least $1.5 million on personal expenses, such as utilities, charge card bills, medical and dental expenses.

29. Wheeler also misappropriated at least $1.8 million in investor funds to pay purported interest payments and PSA commissions to the 5 Relief Defendants.

### G. Wheeler Issued Fraudulent Monthly Investor Statements

30. During the relevant period, Wheeler, or individuals under his direction, sent monthly account statements to each investor who gave funds to Wheeler, Long Point or CDM. The statements included calculations of the principal amount owed to the investor and the purported compounded monthly interest owed to date.

31. These monthly account statements were false because Wheeler's investments never earned the profits necessary to repay the principal and the compounded monthly rates of interest shown on the account statements. Not only did the account statements falsely represent that investor funds were growing, but they also failed to disclose the large sums of money misappropriated by Wheeler or lost as a result of his investments.

32. In reality, Wheeler was able to issue monthly interest checks to some investors and commission checks to the Relief Defendants solely because he was repaying "earlier" investors with "new" investor funds, in a manner akin to a Ponzi scheme.

33. Under the terms of Wheeler's, Long Point's and CDM's purported loan agreements, investors were required to give written notice 60 days prior to their loan's maturity date in order to receive a return of their funds. Many investors have asked for a return of their money, but have not been repaid by Wheeler, Long Point or CDM.

**H.     Statutory Background**

34.     Section 2(c)(2)(B)(i)-(ii) of the Act, 7 U.S.C. § 2(c)(2)(B)(i)-(ii) (2001), provides that the CFTC shall have jurisdiction over an agreement, contract or transaction in foreign currency that is a sale of a commodity for future delivery, so long as that contract is "offered to, entered into with, a person that is not an eligible contract participant," unless the counterparty, or the person offering to be a counterparty, is a regulated entity, as defined therein.

35.     Section 1a(12)(A)(v) of the Act, 7 U.S.C. § 1a(12)(A)(v) (2001), defines an eligible contract participant as a corporation, partnership, proprietorship, organization, trust, or other entity that: (a) has total assets exceeding $10 million; (b) the obligations of which under an agreement, contract, or transaction are guaranteed or otherwise supported by a letter of credit or keep-well, support, or other agreement by a financial institution, regulated insurance company, regulated investment company or commodity pool, as defined; or c) has a net worth exceeding $1 million and enters the transaction in connection with the conduct of the entity's business or to manage the risk associated with an asset or liability owned or incurred, or reasonably likely to be owned or incurred by the entity in the conduct of the entity's business.

36.     Fleury is not a regulated entity and is not a proper counterparty for retail foreign currency transactions. Nor was either Long Point, CDM or Wheeler an eligible contract participant. The Commission, therefore, has jurisdiction over the foreign currency futures transactions between Long Point and Fleury.

## V.

## VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS

### COUNT I

### FRAUD BY MISAPPROPRIATION AND MISREPRESENTATION VIOLATIONS OF SECTION 4b(a)(2)(i) and 4b(a)(2)(iii) OF THE ACT AND REGULATION 1.1(b)(1) and (3):

37. Paragraphs 1 through 36 are re-alleged and incorporated herein.

38. During the relevant time, Wheeler violated Section 4b(a)(2)(i) and (iii) of the Act, 7 U.S.C. §§ 6b(a)(2)(i) and (iii), and Regulation 1.1(b)(1) and (3), 17 C.F.R. § 1.1(b)(1) and (3) (2002), in that he cheated or defrauded or attempted to cheat or defraud investors or prospective investors in the investment program and willfully deceived or attempted to deceive investors or prospective investors by, among other things: misappropriating funds received from investors and using the funds for personal expenses or to pay earlier investors, in a manner akin to a Ponzi scheme; misrepresenting his profits trading foreign currency futures contracts to investors and prospective investors; and downplaying the risks of foreign currency futures trading by stating that he could limit losses.

39. Defendant engaged in this conduct in or in connection with orders to make, or the making of, contracts of sale of commodities for future delivery, made, or to be made, for or on behalf of other persons where such contracts for future delivery were or may have been used for (a) hedging any transaction in interstate commerce in such commodity, or the products or byproducts thereof, or (b) determining the price basis of

any transaction in interstate commerce in such commodity, or (c) delivering any such commodity sold, shipped, or received in interstate commerce for the fulfillment thereof.

40. The actions and omissions of Wheeler described in this count were done within the scope of his employment and as an agent of Long Point and CDM. Therefore, Long Point and CDM are also liable for Wheeler's violations of Section 4b(a)(2)(i) and (iii) of the Act and Regulation 1.1(b)(1) and (3), pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2001).

41. Wheeler, directly or indirectly, controlled Long Point and CDM, and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting Long Point's and CDM's violations alleged in this count. Wheeler is thereby liable for Long Point's and CDM's violations of Section 4b(a)(2)(i) and (iii) of the Act and Regulation 1.1(b)(1) and (3), pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

42. Each material misrepresentation or omission, each false report or statement, and each willful deception made during the relevant period, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4b(a)(2)(i) and (iii) of the Act and Regulation 1.1(b)(1) and (3).

## COUNT II

### PROVIDING FALSE STATEMENTS TO INVESTORS VIOLATIONS OF SECTION 4b(a)(2)(ii) OF THE ACT AND REGULATION 1.1(b)(2):

43. Paragraphs 1 through 36 are re-alleged and incorporated herein.

44. During the relevant time, Wheeler violated Section 4b(a)(2)(ii) of the Act, 7 U.S.C. § 6b(a)(2)(ii), and Regulation 1.1(b)(2), 17 C.F.R. § 1.1(b)(2) (2002), in that he,

or persons working under his direction, willfully made or caused to be made false reports or statements thereof by preparing and issuing false account statements to investors.

45. Defendant, or persons working under his direction, engaged in this conduct in connection with orders to make, or the making of, contracts of sale of commodities for future delivery, made, or to be made, for or on behalf of other persons where such contracts for future delivery were or may have been used for (a) hedging any transaction in interstate commerce in such commodity, or the products or byproducts thereof, or (b) determining the price basis of any transaction in interstate commerce in such commodity, or (c) delivering any such commodity sold, shipped, or received in interstate commerce for the fulfillment thereof.

46. The actions and omissions of Wheeler described in this count were done within the scope of his employment and as an agent of Long Point and CDM. Therefore, Long Point and CDM are also liable for Wheeler's violations of Section 4b(a)(2)(ii) of the Act and Regulation 1.1(b)(2), pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2001).

47. Wheeler, directly or indirectly, controlled Long Point and CDM, and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting Long Point's and CDM's violations alleged in this count. Wheeler is thereby liable for Long Point's and CDM's violations of Section 4b(a)(2)(ii) of the Act and Regulation 1.1(b)(2), pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

48. Each false report or statement made during the relevant period, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4b(a)(2)(ii) of the Act and Regulation 1.1(b)(2).

## COUNT III

### DISGORGEMENT OF FUNDS FROM THE RELIEF DEFENDANTS

49. Paragraphs 1 through 36 are re-alleged and incorporated herein.

50. Defendants have defrauded investors in connection with soliciting funds for the trading of foreign currency futures contracts.

51. The Relief Defendants have received the following funds in excess of their investment that were obtained as a result of the Defendants' fraudulent conduct and have been unjustly enriched thereby:

| | | |
|---|---|---|
| Cole | at least | $ 319,500 |
| Donatelli | at least | $ 196,000 |
| Fagan | at least | $ 233,000 |
| Mendoza | at least | $ 109,000 |
| Wood | at least | $ 1 million |

52. The Relief Defendants have no legitimate entitlement to or interest in all of the funds received as a result of the Defendants' fraudulent conduct.

53. By reason of the foregoing, the Relief Defendants hold funds in constructive trust for the benefit of investors who were victimized by defendants' fraudulent conduct.

54. The Relief Defendants should be required to disgorge funds up to the amount they received from the Defendants' fraudulent conduct or the value of those funds that the Relief Defendants may have subsequently transferred to third parties.

## VI.

## **RELIEF REQUESTED**

Wherefore, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers:

A. Find that defendants violated Sections 4b(a)(2)(i), (ii) and (iii) of the Act, 7 U.S.C. §§ 6b(a)(2)(i), (ii) and (iii), and Regulation 1.1(b)(1), (2) and (3), 17 C.F.R. § 1.1(b)(1), (2) and (3) (2002);

B. Enter orders of preliminary and permanent injunction restraining and enjoining Defendants and all persons insofar as they are acting in the capacity of their agents, servants, successors, assigns, and attorneys, and all persons insofar as they are acting in active concert or participation with him who receive actual notice of such order by personal service or otherwise, from directly or indirectly:

1. Destroying, mutilating, concealing, altering or disposing of any books and records, documents, correspondence, brochures, manuals, electronically stored data, tape records or other property of Defendants and Relief Defendants, wherever located, including all such records concerning defendants' business operations;

2. Refusing to permit authorized representatives of the Commission to inspect, when and as requested, any books and records, documents, correspondence, brochures, manuals, electronically stored data, tape records or other property of Defendants and

                Relief Defendants, wherever located, including all such records concerning Defendants' and Relief Defendants' business operations; and

    3. Withdrawing, transferring, removing, dissipating, concealing or disposing of, in any manner, any funds, assets, or other property, wherever situated, including but not limited to, all funds, personal property, money or securities held in safes, safety deposit boxes and all funds on deposit in any financial institution, bank or savings and loan account held by, under the control, or in the name of Defendants and Relief Defendants.

C. Enter orders of preliminary and permanent injunctions prohibiting the defendants and any other person or entity associated with them, including any successor thereof, from:

    1. engaging in conduct, in violation of Sections 4b(a)(2)(i), (ii) and (iii) of the Act, 7 U.S.C. §§ 6b(a)(2)(i), (ii), and (iii), and Regulation 1.1(b)(1), (2) and (3), 17 C.F.R. § 1.1(b)(1), (2) and (3) (2002);

    2. engaging in, controlling, or directing the trading of any commodity futures or options accounts for or on behalf of any other person or entity, whether by power of attorney or otherwise;

D. Enter an order directing the Defendants, Relief Defendants, and any successors thereof, to disgorge, pursuant to such procedure as the Court

      may order, all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues and trading profits derived, directly or indirectly, from acts or practices which constitute violations of the Act as described herein, including pre-judgment interest thereon from the date of such violations;

E.     Enter an order directing the Defendants to make full restitution to every customer whose funds were received by him as a result of acts and practices which constituted violations of the Act and Regulations, as described herein, and interest thereon from the date of such violations;

F.     Enter an order assessing a civil monetary penalty against each Defendant in the amount of not more than the higher of $120,000 or triple the monetary gain to the Defendant for each violation by the Defendant of the Act or Regulations;

G.     Enter an order directing that the Defendants and Relief Defendants make an accounting to the court of all their assets and liabilities, together with all funds they received from and paid to clients and other persons in connection with commodity futures transactions or purported commodity futures transactions, and all disbursements for any purpose whatsoever of funds received from commodity transactions, including salaries, commissions, interest, fees, loans and other disbursements of money and property of any kind, from, but not limited to, December 2000 to and including the date of such accounting;

  H. Enter an order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2); and

  I. Order such other and further remedial ancillary relief as the Court may deem appropriate.

Dated:  January 30, 2003        Respectfully submitted,

                  ATTORNEYS FOR PLAINTIFF
                  COMMODITY FUTURES TRADING
                  COMMISSION
                  525 West Monroe Street
                  Suite 1100
Of Counsel              Chicago, Illinois  60661

MATTHEW D. ORWIG        Diane M. Romaniuk
UNITED STATES ATTORNEY      Senior Trial Attorney
Steven M. Mason           Illinois ARDC No. 0341649
Assistant U.S. Attorney         (312) 596-0541
State Bar No. 13158700         (312) 596-0714 (facsimile
110 North College, Suite 700
Tyler, Texas 75702           Ava Gould
(903) 590-1400            Senior Trial Attorney
(903) 590-1436 (facsimile)        Illinois ARDC No. 06194302
steve.mason@usdoj.gov         (312) 596-0535

                  Rosemary Hollinger Associate Director
                  Illinois ARDC No. 03123647
                  (312) 596-0520